## Philadelphia Transportation Co. v. Pennsylvania Public Utility Commission

*Robert L. Rubendall* and *Peter Platten*, for plaintiffs.

*Miles Werner* and *Louis J. Carter*, for defendant.

*William D. Valente*, Assistant City Solicitor and *David Berger*, City Solicitor, for City of Philadelphia, intervening defendant.

NEELY, J., October 27, 1958.—In this proceeding in equity, plaintiff questions the jurisdiction of the Public Utility Commission of the Commonwealth of Pennsylvania under section 1111 of the Public Utility Law of May 28, 1937, P. L. 1053, as amended, 66 PS §1441. Plaintiff makes an attack upon the commission's suspension order dated August 11, 1958.

Plaintiff, Philadelphia Transportation Company, herein referred to as PTC, is a common carrier of pas-

sengers by rail and motor bus within the City of Philadelphia, and by its elevated railway reaches 69th Street in Delaware County. The interpleaded plaintiff, Philadelphia Suburban Transportation Company, is a common carrier of passengers by motor bus in the western area of the City of Philadelphia and also extensively in its suburbs.

Defendant, by agreement with plaintiff, interpleaded the Philadelphia Suburban Transportation Company, herein referred to as PST, as coplaintiff. The City of Philadelphia has been permitted to intervene in support of defendant's position in this case. To plaintiff's complaint, defendant, Public Utility Commission, filed its answer and the matter came on for hearing before the chancellor.

The complaint alleges that plaintiff, PTC, had filed with defendant commission, pursuant to its agreement with the interpleaded plaintiff, PST, a certain tariff effective March 23, 1956, providing for joint one-way fares over three routes of these two plaintiffs, that while each of these routes traversed the elevated railway line of plaintiff, PTC, passengers riding on this joint fare were interchanged at 69th Street, and were then transported over three of the interpleaded plaintiff's, PST, routes G, Y and I, that plaintiff filed a supplemental tariff to be effective March 31, 1958, cancelling routes G and Y, and providing that only route I should remain operative, that a joint fare was proposed in the supplemental tariff over route I, and the elevated line of plaintiff, PTC, interchanging at 69th Street, that the fare in the supplemental tariff was to be $.25, which was the same fare that prior to the supplement had been published for the joint routes over the said elevated railway line of PTC and routes G, Y and I of PST.

The complaint alleges that the commission suspended from August 31, 1958, to February 28, 1959, a period

of six months, the operation of the supplement. The complaint avers that the commission was without power to suspend the joint fares proposed in the supplement and invoked the jurisdiction of this court, praying that we enjoin the commission from attempting to suspend the effective date of the supplement or from taking any action designed to declare the supplement to be ineffective, that we direct the commission to rescind its suspension order and that we grant such other relief as shall be deemed necessary and proper.

Defendant by its answer admits a substantial number of the factual averments of the complaint. However, defendant takes issue with plaintiff's contention concerning the power of the commission. Defendant asserts the validity of the suspension order and claims that the commission had full power to enter the order in question. . . .

### Discussion

We are here concerned with the power of the commission to enter its suspension order of August 11, 1958, which retains for six months the joint passenger fare of $.25 over PST's bus routes G, Y and I, interchanging with PTC's elevated railway line at 69th Street in Delaware County, and which postpones the effective date of supplemental tariff discontinuing the joint rate over routes G and Y.

Under the provisions of section 1111 of the Public Utility Law, it is "the duty, of the Dauphin County Court, to entertain a bill to enjoin the Commission from acting in this case or in any other in which the powers and authority of the Commission to act are called in question": York Railways Company v. Driscoll, 331 Pa. 193, 196 (1938). See also Bell Telephone Company of Pennsylvania v. Driscoll, 343 Pa. 109, 112 (1941) ; Philadelphia Electric Company v. Public Service Commission, 314 Pa. 207 (1934) ; Citizens Passen-

ger Railway Co. v. Public Service Commission, 271 Pa. 39 (1921); Reed v. Pennsylvania Public Utility Commission, 174 Pa. Superior Ct. 132 (1953); Beaver Valley Water Company v. Driscoll, 51 Dauph. 105, 114 (1941).

The question before us now is simply whether the suspension order must be considered as being invalid because it was beyond the power of the commission to enter that order.

Plaintiff contends that the commission is without power to order the establishment of a joint rate for this interchanged bus and rail service. It is argued that since the commission is without power to require such a joint rate, it cannot suspend the supplemental tariff abolishing the joint fare over routes G and Y, the effect of the suspension order being to continue the joint fare over these routes, which continuance, it is contended, the commission has no power to require.

Plaintiff particularly argues that section 405(a) of the Public Utility Law, 66 PS §1175, relates only to rail carriers, and hence gives the commission no authority to require the establishment of the joint rate in question involving an interchange between PTC's elevated railway and PST's motor bus lines. We do not need to pass on this contention since it is obvious that the joint rate was in no sense established under the provisions of section 405(a).

Section 405(a) provides that: "Every common carrier shall construct and maintain, whenever the commission may, after hearing had upon its own motion or upon complaint, require the same, such switch or other connections with or between the lines of a like common carrier, . . . and shall establish through routes and service therein, and joint rates applicable thereto, . . ." The joint rate in question over the PTC route and the three PST routes G, Y and I was not a

rate established either after hearing or upon the commission's own motion.

The suspension order of August 11, 1958, continued in effect the rate over routes G, Y and I for a period of six months. The rate which was continued was the voluntary rate agreed upon between these carriers over these routes made effective March 23, 1956, by the joint tariff of PTC and PST filed with the Public Utility Commission, pursuant to an agreement between these two utilities.

The joint rate in question, then, was not a rate required by the commission. It was a rate which the two utilities involved herein, PTC and PST, agreed should be applicable for which a tariff was filed in accordance with the requirements of section 302 of the Public Utility Law, 66 PS §1142.

We accept as pertinent the language in the commission's order of June 16, 1958, exhibit E of the complaint, introduced in evidence. The Commission, inter alia, stated:

". . . This joint fare arrangement was a device which had been entered into voluntarily by PTC and PST years ago when the PTC street-railway line did not extend into the affected area, and was accepted by the Commission as a temporary remedy at a time when it was determined that conditions did not warrant ordering an extension of Route 31. Residents of the area who wished to go into central Philadelphia could, by virtue of this joint fare arrangement, use the PST bus to its 69th Street terminus, and there board the PTC elevated for the journey into the center of the city. As a result of the convenience of the combined service and the attractive joint fare offered and limited to residents of the Overbrook Park area, substantial usage is made of the routing."

It seems to us that the authority of these two utilities to establish voluntarily the joint fare for service

over these joint routes by their tariff dated March 23, 1956, is recognized in section 2, subparagraphs 19 and 20, of the Public Utility Law, 66 PS §1102, wherein it is stated:

"(19) 'Rate' means every individual, or joint fare, toll, charge, rental, or other compensation whatsoever of any public utility, . . .

"(20) 'Service' is used in this act in its broadest and most inclusive sense, and includes any and all acts done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities, or contract carriers by motor vehicle, in the performance of their duties under this act to their patrons, employes, other public utilities, and the public, as well as the interchange of facilities between two or more of them, . . ."

In Motor Freight Express and Horn's Motor Express, Inc., v. Public Service Commission, 117 Pa. Superior Ct. 165 (1935), in interpreting article II, sec. 1, of The Public Service Company Law of July 26, 1913, P. L. 1374, an interchange of freight between two motor carriers which had been going on for many years, was considered a voluntary and permissive service.

We find also that the authority of public utility companies to establish joint rates is recognized in section 301 of the Public Utility Law, 66 PS §1141, which provides as follows:

"Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission: . . ."

And section 306 of the same act, 66 PS §1146, concerning the apportionment of joint rates, states:

"Where public utilities entitled to share in any joint rate shall be unable to agree upon the division thereof, . . ."

The rate published by the joint tariff on March 23, 1956, was made by these utilities for which they filed their tariff under section 302. A rate published by a utility in its tariff, pursuant to section 302, is in the first instance the rate of the utility, and only becomes a commission-made rate when it has been fixed by the commission pursuant to a complaint, or where it has otherwise been determined by the commission.

In our judgment, then, the joint rate of these two utilities for the joint service in question was their own voluntary rate. This was in no sense a commission-made rate. The supplemental tariff proposed to eliminate the joint fare over routes G and Y (PST). The suspension order of August 11, 1958, required PTC and PST to retain in operation the joint rate for service over routes G, Y and I from August 31, 1958, to February 28, 1959.

Bearing in mind, then, that these joint rates were made by the utilities themselves, did the Public Utility Commission have the authority by its suspension order to eliminate during that period the cancellation of the joint rates on routes G and Y, and thereby require the maintenance of the joint rate during the period of suspension for routes G, Y and I? We think the answer to this question must be in the affirmative because of the provisions of section 308 of the act, 66 PS §1148, relating to voluntary changes in rates. Section 308 (*b*) provides that:

"(b) Whenever there is filed with the commission by any public utility any tariff stating a new rate, the commission may, either upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and pending such hearing and the decision thereon, the commission, upon filing such tariff and delivering to the public utility affected thereby a statement in writing of

its reasons therefor, may, at any time before it becomes effective, suspend the operation of such rate for a period not longer than six months from the time such rate would otherwise become effective, . . . The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension, unless the commission shall establish a temporary rate as authorized in section three hundred ten of this act."

The commission may suspend the operation of a new rate and maintain in force the old rate. Did the supplement publish a new rate? We think that it did. The rate published in the tariff was $.25 for service over the joint PTC and PST routes G, Y and I. The supplemental tariff provided for a joint rate of $.25 for route I. The effect of the supplement is to require passengers to pay a basic rate of $.20 over PST's routes G and Y, and an additional basic rate of $.20 over PTC's elevated line. The supplemental tariff then calls for a rate of $.25 on one of the old routes and has the effect of requiring rates of $.40 over the other two routes.

We think it would be a narrow and restrictive interpretation of section 308(b) to hold that a tariff, which makes a voluntary change in the rate structure in this area, does not state a new rate where patrons in the area would be required to pay increased rates over the routes where they formerly had joint service. " 'Service' is used in this act in its broadest and most inclusive sense.": Section 2(20), supra. The joint service formerly performed over routes G and Y for $.25, under the supplemental tariff would be performed only for $.40.

The power of the commission to suspend new rates under section 308(b) of the Public Utility Law is an administrative function and with few exceptions is within the commission's sound discretion, and the action of the commission in suspending or not suspending the proposed tariffs does not indicate commission ap-

proval or nonapproval of the rates in the tariffs, the reasonableness of which remains open for ultimate disposition: Pittsburgh v. Pennsylvania Public Utility Commission, 178 Pa. Superior Ct. 368 (1955). Cf. South Pittsburgh Water Co. v. Pennsylvania Public Utility Commission, 4 D. & C. 2d 495 (1955).

We are of the view that the Public Utility Act conferred power on the commission to enter its order of suspension dated August 11, 1958. The ultimate approval or nonapproval of the rate published in the supplemental tariff affecting the Overbrook Park area remains open for the commission's ultimate disposition.

We are here concerned only with the power of the commission to enter its order of suspension. We have no jurisdiction to determine in any way the adequacy of the service in Overbrook Park. That is a matter that is essentially within the province of the commission.

Plaintiff offered evidence to show that route 31 extended enters Overbrook Park, and that at most within two or three blocks all persons within this area of 10,000 people can have access either to route I (PST) or route 31 (PTC), that route I passengers can interchange at 69th Street for a joint fare of $.25, and that by using route 31 all PTC passengers can interchange at 63rd Street. There is some testimony that the 63rd Street station of PTC's line is elevated, which is objectionable to some passengers. There is also evidence that 63rd Street is a skip-stop station, meaning that some of PTC's trains pass this station without stopping. These matters are all within the jurisdiction of the commission.

In view of the foregoing, we make the following

*Conclusion of Law*

1. It was within the power of the commission to enter its order of suspension dated August 11, 1958.

*Decree Nisi*

And now, October 27, 1958, it is ordered, adjudged and decreed that plaintiff's complaint be and the same hereby is dismissed. The prothonotary is directed to enter this decree nisi and notify the parties to this proceeding or their counsel forthwith. If no exceptions are filed within 20 days after the entry of this decree, a final decree will be entered. The costs of this proceeding shall be paid by plaintiff.